UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, et al., | Case No. 13-cv-01924-SI |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT JOHN MUIR HEALTH'S MOTION FOR SUMMARY JUDGMENT** |
| JOHN MUIR HEALTH, et al., | |
| Defendants. | Re: Dkt. No. 45 |

Plaintiff-Relator Pamela K. Lindersmith ("plaintiff") advances the present action for retaliation and wrongful employment termination pursuant to 31 U.S.C § 3730(h), California Labor Code § 1102.5, and the common law tort of wrongful termination in violation of public policy. Her complaint alleges that her former employer, defendant John Muir Health ("JMH"), and defendant Bay Area Therapeutic Radiology & Oncology Associates Medical Group, Inc. ("BATROA") engaged in actions that violated the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and that she was retaliated against and wrongfully terminated when she attempted to stop JMH from presenting false claims for payment to the United States government. Dkt. No. 28, First Amended Compl. ("FAC"). Defendant JMH moved for summary judgment, or in the alternative, partial summary judgment. Dkt. No. 45. The parties presented oral argument on the motion on June 2, 2016. Having carefully considered the parties' submissions, the Court hereby **GRANTS** JMH's motion in part and **DENIES** it in part.

## BACKGROUND

Plaintiff is a former employee of JMH, a hospital and corporation with its principal place of business in Contra Costa County, California. FAC ¶¶ 2, 3; Dkt. No. 53, Decl. of Thomas ¶ 2.

United States District Court
Northern District of California

She began her career as a radiation therapist in 1986, and in 1997 JMH hired plaintiff as a per diem radiation therapist.  FAC ¶ 18; Dkt. No. 46-1, Plaintiff Depo. at 8.[1]  In 2000, JMH promoted plaintiff to Chief Therapist of JMH's Walnut Creek campus.  FAC ¶ 18; Dkt. No. 46-1, Plaintiff Depo. at 8-9.  During the time that plaintiff served as Chief Therapist, she reported directly to the Radiation Oncology Manager of the Walnut Creek Campus, Margaret Murphy.  Dkt. No. 46-1, Plaintiff Depo. at 9.  Murphy reported to the Executive Director of Medical Imaging and Radiation Oncology, who as of July 2003 was Don Colombana.  Dkt. No. 46-2, Colombana Depo. at 3-4.

In May 2006 Colombana conducted a meeting with plaintiff to discuss performance concerns he had with her, including her ability to maintain healthy working relationships with colleagues like Murphy.  Dkt. No. 46-1, Plaintiff Depo. at 19, 24-25.  In late 2006 Murphy met with plaintiff to discuss continued communication issues the two were having.  Dkt. No. 48-1, Decl. of Murphy at 2-4.  In March 2007 Colombana wrote in an email to JMH's Director of Human Resources that plaintiff "is very critical of her colleagues, alienates them, and operates with a complete lack of team work."  Dkt. No. 49-1, Exh. to Decl. of Mamuyac  at 2.  In the same email Colombana noted that plaintiff and Murphy "have equal responsibility for the problems in th[e] department."  *Id.*  Colleagues recalled that "personality clashes" between Murphy and plaintiff during this time were "significant."  Dkt. No. 46-3, Villanueva Depo. at 48.  In April 2007 Colombana prepared an addendum to plaintiff's 2006 employment evaluation describing his concerns with plaintiff's work performance.  Dkt. No. 46-3, Exh. to Decl. of Fitzsimmons at 6.  In the document Colombana wrote:

> [Y]our leadership is tenuous and your ability to successfully supervise the Radiation Oncology department is in question.  If you are to succeed in this role in the future, you must demonstrate solid leadership skills, proactive support of others, superb communication and positive results in relationships with stakeholders if you are to regain the ground lost during this year.  You must be aware that if you are unable to perform the full scope of your job and demonstrate success in each of these areas, we will have no alternative but to take further action, including terminating your employment.

*Id.*

---

[1] The page numbers cited refer to the page numbered generated by ECF.

Murphy left JMH in 2007.  Dkt. No. 48, Decl. of Murphy ¶ 1.  In 2008, JMH promoted plaintiff to Manager of JMH's Walnut Creek Radiation Oncology Department, with continuing management responsibilities over the Neuro-Oncology Program at both campuses.  Plaintiff began to report to Colombana directly.  FAC ¶ 18; Dkt. No. 46-1, Plaintiff Depo. at 10-12; Dkt. No. 46-2, Colombana Depo. at 28-29.

In or around December 2009, as part of her duties as Manager of JMH's Walnut Creek Radiation Oncology Department, plaintiff attended a conference on Medicare billing for radiation oncology procedures in which physician supervision requirements were discussed.[2]  FAC ¶ 19; Dkt. No. 46-1, Plaintiff Depo. at 44.  Plaintiff was informed at the conference that supervision requirements for Medicare reimbursement had changed and that in order to bill for a reimbursement, physicians in the neuro science group had to be present in order to supervise the procedure.  Dkt. No. 46-1, Plaintiff Depo. at 47.

After the December 2009 conference, plaintiff asserts that she discussed the supervision requirements with the BATROA physicians and JMH personnel at a meeting and informed them of their obligation to comply with the supervision requirements as a condition of payment by Medicare.  FAC at ¶ 19; *see also* Dkt. No. 46-1, Plaintiff Depo. at 45-48.  Plaintiff also asserts that in either December 2009 or January 2010, she posted the written guidelines on how to comply with the supervision requirements on a shared computer drive and emailed the relevant physicians to tell them where it was located.  She testified that she alerted the physicians in an email where to find the documents and highlighted the areas that showed the supervision requirements so that the requirements "were easy to find."  Plaintiff testified that she gave the requirements to another physician and "we subsequently distributed th[e requirements] to all the BATROA physicians as

---

[2] These physician supervision requirements for Medicare reimbursement are the subject of federal law:  "Medicare pays for therapeutic hospital or [critical access hospital (CAH)] services and supplies furnished incident to a physician's or nonphysician practitioner's service . . . if . . . [t]hey are furnished . . . [u]nder the direct supervision (or other level of supervision as specified by [Centers for Medicare & Medicaid Services (CMS)] for the particular service) of a physician or a nonphysician practitioner . . . .  "[D]irect supervision" means that the physician or nonphysician practitioner must be immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be present in the room when the procedure is performed[.]"  42 C.F.R. § 410.27(a)(1)(iv)(A).

United States District Court
Northern District of California

1   well."   Dkt. No. 46-1 at 45-46, 53-54.   Defendant JMH disputes this account of plaintiff's

2   activities following the December 2009 conference.   *See* Dkt. No. 45 at 23, Motion.

3          On September 8, 2010, plaintiff emailed the Executive Director of Oncology Services

4   (Brenda Carlson), Colombana, the Radiation Oncology Manager of the JMH Concord campus

5   (Rekha Patel), and the Director of Colorectal, Thoracic and Urology (Janice Hoss) about the

6   guidelines related to physician supervision in treating Medicare patients, because she wanted

7   "their opinion on what they were reading."   Dkt. No. 46-1, Plaintiff Depo. at 52-56; Dkt. No. 46-3,

8   Exh. to Decl. of Fitzsimmons 15.   She wrote:

9          I am not comfortable with the statement that we currently have direct supervision
           of all our radiation therapy treatments.   According to these guidelines and the
10         statements made . . . at the Dec. 2009 . . . conference, we do not.   We have direct
           supervision most of the time, but not all of the time. . . . Please review and see if
11         you agree based on these definitions.

12   Dkt. No. 46-3, Exh. to Decl. of Fitzsimmons 15.

13   There is no evidence that action was taken by JMH at that time in response to plaintiff's concerns.

14          Dr. William Bice was hired in November 2010 by JMH as Chief Physicist.   Dkt. No. 47,

15   Decl. of Bice ¶ 2. From the beginning of his employment at JMH he found plaintiff "to be

16   someone [who] was difficult to communicate with" and he "did not think that [plaintiff] was a

17   strong team player."   *Id.* at ¶ 3.

18          Plaintiff asserts that in 2010, 2011, and 2012 she attended monthly management meetings

19   with Colombana, the BATROA doctors, and (after he was hired), Dr. Bice.   Dkt. No. 60, Decl. of

20   Plaintiff ¶ 9.   Plaintiff states that at numerous meetings where Dr. Bice was present, she informed

21   those in attendance that JMH and BATROA were not compliant with Medicare supervision

22   requirements; plaintiff asserts that this happened more than 10 times between 2008 and 2012.   *Id.*;

23   Dkt. No. 59-3, Plaintiff Depo. at 18.   Defendant JMH disputes plaintiff's account of these

24   meetings.   *See* Dkt. No. 45 at 23, Motion.

25          Colombana completed plaintiff's 2010 year-end review on December 28, 2010 and rated

26   her 4.13 out of 5 overall.[3]   Dkt. No. 46-3, Exhibit to Decl. of Fitzsimmons at 12.   Plaintiff received

27

28          [3] JMH objects to plaintiff's inclusion of her performance reviews as inadmissible hearsay.
     Dkt. No. 63 at 6.   This objection is OVERRULED at this time.   In any event, the Court does not

United States District Court
Northern District of California

"4-proficient" or "5-expert" on all categories, except in the area of "Leadership Competencies" where she received a "3-competent" under the "Interpersonal/Communications" subcategory. *Id.* In this subcategory Colombana wrote:

> Pamela's communication style is very direct, which is ok most of the time, but can be interpreted negatively at times. The result of this is that although Pamela's leadership is strong and direction correct, the style can at times not build cooperative working relationships or foster collaboration. . . . Pamela should seek a balance between driving the changes that need to be made in Radiation Oncology and developing [her] communication behaviors and outcomes[.]

*Id.* at 10.

In March 2011 Colombana, at the urging of plaintiff, hired a mediator who had previously worked with members of the JMH staff. Dkt. No. 46-2, Colombana Depo. at 38. According to Colombana, the purpose of the mediator was to "facilitate communication and collaboration between [plaintiff] and [Dr. William] Bice." *Id.* Dr. Bice stated that the mediator "did not seem to help," and that he observed plaintiff's "weak leadership and poor communication . . . with many others on both campuses during the time [he] was Chief Physicist." Dkt. No. 47, Decl. of Bice ¶ 3. Dr. Bice described plaintiff's Radiation Oncology Department as a place of "turmoil" which he "attributed largely" to plaintiff. *Id.*

In May 2011, the Radiation Oncology Manager at the Concord campus (Rekha Patel) left JMH. Dkt. No. 46-2, Colombana Depo. at 29-30; Dkt. No. 49, Decl. of Mamuyac ¶ 4. An outside consulting company assessed the department and recommended that the department hire a single manager who could manage both campuses. Dkt. No. 46-2, Colombana Depo. at 30. At this time plaintiff was the Radiation Oncology Manager at the Walnut Creek campus. Dkt. No. 28, FAC ¶ 18. The Concord position remained vacant for over a year.[4] Dkt. No. 49, Decl. of Mamuyac ¶ 4.

---

rely on the content of plaintiff's performance reviews in its analysis.

[4] Imar Moreira was named the Interim Manager of Radiation Oncology at the Concord campus in May 2011. Dkt. No. 51, Decl. of Moreira ¶ 2. In that role, Moreira found plaintiff "difficult to communicate with" because plaintiff "frequently refused to listen to others' opinions that were different from her own." *Id.* at ¶ 3. Additionally, Moreira noted that plaintiff "seemed to have difficulty accepting that any way other than her own could be correct" and Moreira observed that "physicists who came from Concord would regularly talk to [Moreira] about how difficult it was to work and communicate with [plaintiff]." *Id.* at ¶¶ 3-4.

United States District Court
Northern District of California

Around the summer of 2011 Colombana and plaintiff began to spend time alone together while at work.  Dkt. No. 46-1, Plaintiff Depo. at 76; Dkt. No. 46-2, Colombana Depo. at 43-44, 48-50.  Many people in the department suspected that Colombana and plaintiff were romantically involved.  Dkt. No. 50, Decl. of Aiton ¶ 4.  At least one employee testified that she began to question whether she could discuss her frustrations with plaintiff to Colombana during this time. *Id.*  In the early summer of 2012 JMH's President, Mike Thomas, met with Colombana to discuss the rumor that Colombana and plaintiff were having an affair.  Dkt. No. 46-2, Colombana Depo. at 45-46.  Colombana denied the rumor.[5]  *Id.*; Dkt. No. 53, Decl. of Thomas ¶ 3.

In February 2012 Colombana received a written warning from Thomas and the President of the Walnut Creek Campus (Jane Willemsen), detailing JMH's concern about an unrelated issue related to compliance.  Dkt. No. 46-3, Exh. to Decl. of Fitzsimmons at 17.  The memo directed Colombana to "make compliance a priority and ensure that JMH is meeting all regulatory requirements within [Colombana's] areas of responsibility."  *Id.* The memo cautioned that "[a]ny issues regarding noncompliance will lead to further disciplinary action, up to and including, termination."  *Id.*

According to plaintiff, she informed Colombana that she wished to bring up the physician supervision issue again, given JHM's heightened compliance awareness.  Plaintiff testified that Colombana then organized a meeting with plaintiff, Colombana, Dr. Bice, and BATROA physicians in the Spring of 2012.  Dkt. No. 60, Decl. of Plaintiff ¶¶ 10, 11; Dkt. No. 46-1, Plaintiff Depo. at 60; Dkt. No. 59-3, Plaintiff Depo. at 25. At the meeting the physicians disagreed with plaintiff's assessment that they were required to be present during treatment in order to be eligible for Medicare reimbursement.  Dkt. No. 46-1, Plaintiff Depo. at 59-63.  According to plaintiff, the physicians immediately became hostile toward her.  *Id.*; *see also* Dkt. No. 59-2, Plaintiff Depo. at 28-29.  Plaintiff states that Dr. Bice told her on multiple occasions that BATROA doctors could

---

[5] Colombana kissed plaintiff on the lips while she was still working at JMH; plaintiff's employment was terminated on June 18, 2012, Colombana's employment was terminated on September 27, 2012.  Dkt. No. 46-1, Plaintiff Depo. at 74-75; Dkt. No. 46-2, Colombana Depo. at 41, 69-70; Dkt. No. 47, Decl. of Bice ¶ 11.  Colombana and plaintiff were subsequently engaged in early 2014 and married in April 2014.  Dkt. No. 46-2, Colombana Depo. at 40.

"do what they want."[6]   Dkt. No. 60, Decl. of Plaintiff ¶ 12.   JMH disputes that this meeting ever took place.[7]   *See* Dkt. No. 45, Motion at 23; Dkt. No. 63, Reply at 6.

Colombana testified that a few days after the meeting one of the BATROA doctors, Dr. Michael Levine, approached Colombana and expressed concern about plaintiff's intent to "report them to CMS, [*i.e.*] the Federal government" regarding what was discussed in the meeting.   Dkt. No. 46-2 at 51-55.   Colombana assured Levine that plaintiff was not going to report JMH or BATROA to CMS.   *Id.*

On April 3, 2012, plaintiff received an email from a colleague directing her to the CMS website; the colleague wrote, "Let me know if you need further assistance."   Dkt. No. 59-2, Exh. to Decl. of Kunst at 111-112.   Plaintiff forwarded that email to Colombana the next day, writing, "We need to search this site for Physician supervision . . . specific to speciality procedures . . . [.]" *Id.* at 111.   Colombana forwarded plaintiff's email to Jeff Farris, a Quality and Compliance Supervisor at JMH, writing only, "For Radiation Oncology."   *Id.*   Farris replied to Colombana's email by writing to plaintiff (Colombana was carbon copied on the email).   *Id.* at 110. Farris wrote, "I've attached two documents that cover the physician supervision requirements in radiation oncology."   *Id.*   Plaintiff responded to Colombana, "Thanks . . . this is good . . . I suggest we pass on to Beth and let her define expectations for MDs from JMH compliance perspective . . .[.]" *Id.*

On April 16, 2012, JMH President Mike Thomas carbon copied the Vice President of Human Resources, Alice Villanueva, on an email asking whether "[f]rom an HR perspective, [she

---

[6] JMH objects to this statement allegedly made by Dr. Bice to plaintiff as inadmissible hearsay.  Dkt. No. 63, Reply at 6.  This objection is OVERRULED, because the statement is offered not for its truth (physicians plainly cannot "do what they want"), but rather for the fact that Dr. Bice said it, reflecting his state of mind on the matter.  If Dr. Bice denies having made the statement, he may say so at trial.

[7] JMH objects to plaintiff's account of this meeting on the basis that she lacks personal knowledge of the contents of the agenda, since she did not produce a document containing the meeting minutes.  Dkt. No. 63, Reply at 6.  This objection is OVERRULED.  Plaintiff's testimony as to what she recalled of this meeting is based on her personal recollection and observations, and if called as a witness, she would testify to that effect.  Dkt. No. 60, Decl. of Plaintiff ¶ 11.

United States District Court
Northern District of California

had] thoughts or potential concerns if [JMH] were to move Dr. Bice to [be] a director of [Radiation Oncology]," thus replacing Colombana.  Dkt. No. 59-2, Exh. to Decl. of Kunst at 77.

On April 17, 2012, compliance with the "physician presence" requirement was discussed at a management meeting.  Dkt. No. 59-2, Exh. to Decl. of Kunst at 121-122.  Attendees were told that the issue would be sent to the JMH compliance department and reviewed by it, and information was distributed.  *Id.*  Colombana, Dr. Levine, and five other physicians, including Dr. Bice, were present.[8]  *Id.*  Dr. Bice stated in his declaration,

> I understand that [plaintiff] claims she raised the issue of the physician supervision requirement at one meeting in which I was present in early 2012.  Because the issue of physician supervision did not relate to my position as Chief Physicist at the time, I did not participate in any conversation during any such meeting related to that issue nor would I have even engaged in such discussions.

Dkt. No. 47 at ¶ 6.

On April 18, 2012, Villanueva sent an email to Karen Mamuyac, the Director of Human Resources for JMH, with the subject heading, "Pam Lindersmith."  In the email Villanueva wrote, "Do you have a file on, or have 'stuff' on Pam Lindersmith."  Dkt. No. 59-2, Villanueva Depo. at 79.  When asked what prompted her to send this email, Villanueva responded, "Well, again I had gotten at least . . . one call[] from [a] physician, but also [an earlier email from Thomas] had referenced that there were physicians concerned about [plaintiff], but it was my question to Karen 'was there anything else that was going on that she was aware of.'"  *Id.* at 80.  Villanueva stated that she had had discussions with Colombana "several months prior and several years prior about issues with [Radiation Oncology] and with [plaintiff]."  *Id.* at 78.  Villanueva clarified that she was not asking Mamuyac for plaintiff's personnel file, but "if [Mamuyac] had any notes or any – anything relative to if there were things going on in [Radiation Oncology] or diagnostic imaging that [Villanueva] wasn't aware of."  *Id.* at 80.

---

[8] It appears that JMH also objects to plaintiff's statement that an agenda for this or an "early 2012" meeting was sent to Dr. Bice.  JMH asserts that plaintiff lacks personal knowledge that the agenda was sent to Bice.  Dkt. No. 63, Reply at 5-6.  This objection is OVERRULED as moot.  Whether or not the agenda was sent to Bice does not factor into the Court's analysis on this point; Bice is clearly listed as having attended this April 17, 2012 meeting.

United States District Court
Northern District of California

1    On June 7, 2012, Lorna Jones, another member of the JMH HR team, wrote an email to

2  Villanueva and Mamuyac.  Jones wrote:

3        I met with [Dr. William] Bice about his pending role change and the reorganization
       of the department.  He . . . does want to eliminate the existing position held by
4      [plaintiff].  He said [plaintiff] will not be able to function in this new position due
       to her difficulties with communication and physician/employee relations issues.
5      [Plaintiff] no longer has the support of the [Walnut Creek] [n]euro surgeons and
       [Bice] wants to eliminate her position in the next few weeks.  . . . I don't see
6      [plaintiff] being successful in stepping down to a staff role.

7  Dkt. No. 59-2, Exh. to Decl. of Kunst at 136.

8  Villanueva responded to this email an hour or so later:

9        The restructure for [Bice] to be the Director of [Radiation Oncology] is effective
       next Monday . . . it was originally to be effective this past Monday but some of the
10     details of communications weren't completed in time.  [Colombana] will have no
       responsibility for [Radiation Oncology] . . . I met with [Bice] last week, told him
11     we would support him in the plan to exit [plaintiff] from the organization.  One of
       the primary reasons we have carved out [Radiation Oncology] as a separate
12     department and Director is because [Colombana] didn't address the issues with
       [plaintiff] . . . it's not just the [Walnut Creek] neuro surgeons who have issues with
13     [plaintiff], it's many of the [Radiation Oncology] physicians, some who have called
       me about her.  From my discussion with [Bice], the plan was to finalize the job
14     description for this position, recruit for it externally and internally and [plaintiff]
       would not be selected due to her issues with communications to physicians and
15     employees etc.  [Bice] and I both agreed that given the issues that [plaintiff] has she
       would not be successful in a staff position . . . so bottom line, yes this is the right
16     direction . . .

17  *Id.*

18    On June 8, 2012, Colombana completed a performance review for plaintiff that again rated

19  her 4.13 out of 5 overall.  Dkt. No. 60-7, Exh. to Decl. of Plaintiff at 7.  Plaintiff again received

20  "4-proficient" or "5-expert" on all categories except in the area of "Leadership Competencies"

21  where she received a "3-competent" under the "Interpersonal/Communications" subcategory.

22  This time Colombana wrote:

23        [Plaintiff] communicates very clearly and effectively when setting direction for the
       department and staff.    [Plaintiff] continues to take on more leadership
24     responsibilities and has found herself in a broader range of interpersonal and
       leadership communication situations and has handled those situations with
25     intelligence and the ability to articulate clearly.  [Plaintiff]'s communication can be
       very direct and Pamela should continue to promote collaborative communication.
26
   *Id.* at 4.
27

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JHM ultimately underwent a reorganization that led to the centralization of management of the two Radiation Oncology departments (Walnut Creek and Concord).  Dkt. No. 47, Decl. of Bice ¶ 8.  Dr. Bice was promoted to the Director of Radiation Oncology and Colombana's oversight of Radiation Oncology was eliminated.  Dkt. No. 53, Decl. of Thomas ¶¶ 4-5; Dkt. No. 47, Decl. of Bice ¶ 9.  Colombana maintained his Executive Director position over Medical Imaging, and his salary did not change, nor did he view the change in responsibility as a demotion. Dkt No. 46-2, Colombana Depo. at 61-62.

On June 18, 2012, in his first day as Director, Dr. Bice terminated plaintiff's employment. Dkt. No. 47, Decl. of Bice ¶ 11.  Plaintiff was provided a memorandum from Mamuyac detailing that "[d]ue to job restructuring within the Radiation Oncology department at [JMH,] your Walnut Creek Radiation Oncology Manager position will be eliminated, effective immediately."  Dkt. No. 47-1, Exh. to Decl. Bice at 2.  Plaintiff was provided 15.33 weeks of severance pay.  *Id.*

On June 20, 2012, Mamuyac sent an email to Villanueva and Jones with the subject heading, "Meeting this a.m. with [Plaintiff]."  Dkt. No. 59-2, Exh. to Decl. of Kunst at 154. Villanueva forwarded the email to JMH President Mike Thomas with the message, "Just FYI . . ." *Id.*  In the email Mamuyac wrote:

> I met with [plaintiff] this morning.  She's angry about what occurred, how it occurred. . . . She says it feels like the decision by Dr. Bice was retaliatory because she and [Colombana] had been working on some quality measures re Medicare (I may not have gotten that exactly right, as she talked very fast.) . . . She said she wanted to write a letter to Mike Thomas with these concerns about retaliation.

*Id.*

In late June 2012 after plaintiff had been terminated, a position was posted for a "Radiation Oncology Manager" based in the Walnut Creek campus of JMH.  Plaintiff maintains that this advertised position was her former position, and it "eventually" became the dual campus (Walnut Creek and Concord) Manager position.[9]  Dkt. No. 60, Decl. of Plaintiff ¶ 16, Dkt. 60-9, Exh. to Decl. of Plaintiff at 2.  JMH claims that this posting was the "Cross Campus" position and that

---

[9] JMH objects on the basis that plaintiff lacks of personal knowledge on this point.  Dkt. No. 63, Reply at 5.  Because the Court's analysis does not rely on this statement the objection is OVERRULED as moot.

plaintiff applied for three positions at JMH, including the Cross Campus position, but that she was not hired for any position because of her "long standing communication issues" or because she was not qualified.  *See* Dkt. No. 47, Decl. of Bice ¶¶ 14, 16; Dkt. No. 52, Decl. of Peterson ¶¶ 2-5; Dkt. No. 54, Decl. of Yewell ¶¶ 2-5; Dkt. No. 46-1, Plaintiff Depo. at 133-142.

On July 18, 2012, Villanueva received an email from a third party vendor that provides confidential and anonymous exit interviews for JMH.  Dkt. No. 60-8, Exh. to Plaintiff Depo. at 2. The subject of the email was, "Compliance Flag[.]"  Dkt. No. 59-3, Exh. to Decl. of Kunst at 156-157.  The vendor emailed that a former employee had answered, "Yes" to the question, "In your opinion, have there been any compliance issues such as fraud, abuse or other illegal or unethical practices at [JMH]?"  *Id.*  When asked to describe the illegal or unethical practices at JMH the former employee wrote,

> I brought up concerns that the physicians were not being compliant with medicare supervisory guidelines.  I was bringing it up to the physicians and within a month I was terminated and my supervisor [Colombana] was removed from the department.  The physicians did not like that we brought these concerns to their attention.  [Colombana] was removed from the department and I was terminated.  I believe I was terminated because I brought these issues to their attention and I believe my termination was retaliatory.  I brought up these concerns in May, 2012 and was terminated in June, 2012 the day after [Bice] became director.  This was after I provided 15 years of dedicated service to the institution.

*Id.*

After receiving the email, Villanueva forwarded its contents to Mamuyac, with a message that said, "Gee, I wonder who this is? … ☺"  *Id.*

Villanueva maintains that she referred this concern to the compliance department at JMH by email.  Dkt. No. 59-2, Villanueva Depo. at 92.

In August 2012 plaintiff was eventually replaced by former JMH employee Rekha Patel. Dkt. No. 59-3, Exh. to Decl. of Kunst at 108-109.  When Patel was initially terminated by JMH in July 2014 Dr. Bice wrote on her "Separation Report" that while Patel got things done, "she adopted a 'tone' with her employees which created an untenable work environment.  The level of distrust and resentment towards her rose to the point that the staff was unable to function effectively."  *Id.* at 106.

United States District Court
Northern District of California

11

1    Colombana was terminated on September 27, 2012.  Dkt. No. 46-3, Exh. to Decl. of

2 Fitzsimmons at 19.  In the memo terminating Colombana's employment, JMH President Mike

3 Thomas wrote that Colombana had not been "truthful" regarding rumors about an affair between

4 Colombana and plaintiff.  *Id.*  Thomas wrote that Colombana had violated JMH's "core values of

5 honesty and integrity" and that Colombana's "lack of judgment created the potential for

6 significant risk and liability" for JMH.  *Id.*

7    Plaintiff filed her *qui tam* complaint against JMH and BATROA in this Court on April 26,

8 2013.  Dkt. No. 1, Compl.  On June 22, 2015, pursuant to 31 U.S.C. § 3730(b)(2) and (b)(4), the

9 United States notified the Court that it would intervene in the present action against JMH, but not

10 against BATROA.  Dkt. No. 13, Notice.  The United States further advised this Court that it,

11 plaintiff, and JMH had reached a settlement in the case.  *Id.*  A later filed stipulation dismissed the

12 case with prejudice as against JMH, but the settlement agreement did not affect or impair

13 plaintiff's remaining 31 U.S.C. § 3730(h) retaliation claims or wrongful termination claims, or her

14 claims against BATROA.  Dkt. No. 14, Stip.

15    BATROA filed a motion to dismiss plaintiff's complaint on August 28, 2015.  Dkt. No. 22,

16 Motion.  Plaintiff amended her complaint on September 11, 2015, mooting BATROA's motion.

17 Dkt. No. 28, FAC.  BATROA and JMH each timely filed an answer to plaintiff's complaint.  Dkt.

18 Nos. 30, 31, Answer(s).

19    The present motion for summary judgment filed by JMH only challenges plaintiff's

20 allegations of retaliation and wrongful employment termination pursuant to 31 USC § 3730(h),

21 California Labor Code § 1102.5, and the common law tort of wrongful termination in violation of

22 public policy as to JMH.  Dkt. No. 45, Motion.  Plaintiff maintains a cause of action against

23 BATROA for violation of the Federal False Claims Act based upon her allegations that they

24 engaged in fraudulent billing practices.  *See* Dkt. No. 42, Case Management at 2.  Plaintiff also

25 maintains two tort causes of action against BATROA for intentional and negligent interference

26 with prospective economic advantage.  Dkt. No. 28, FAC at 11-12.

27

28

United States District Court
Northern District of California

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the nonmoving party will have the burden of proof at trial. *Id.* at 325. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.*

Once the moving party has met its burden, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 324). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

I.      **Plaintiff's Second Cause of Action for Retaliation in Violation of the Federal False Claims Act, 31 U.S.C. § 3730(h)**

Plaintiff claims that JMH terminated her employment and failed or refused to reinstate, rehire, or consider her for other available positions for which she was qualified in retaliation for

United States District Court
Northern District of California

13

her attempts to stop JMH from presenting false claims for payment to the United States Government.  Dkt. No. 28, FAC ¶ 2.  Specific to this cause of action, plaintiff asserts that she engaged in protected activities in investigating and in furtherance of efforts to stop one or more violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

"The False Claims Act protects 'whistle blowers' from retaliation by their employers." *Moore v. California Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002).  The False Claims Act makes it illegal for an employer to "discharge[], demote[], suspend[], threaten[], harass[], or in any other manner discriminate[] against [an employee] in the terms and conditions of employment . . . because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section . . . ."  31 U.S.C. § 3730(h).  To be successful in a § 3730(h) retaliation claim, an employee must prove three elements: "(1) that the employee engaged in activity protected under the statute; (2) that the employer knew that the employee engaged in protected activity; and (3) that the employer discriminated against the employee because she engaged in protected activity."  *Moore*, 275 F.3d at 845.  "The emphasis of the claim is on the employee's protected action and whether the employer retaliated against the employee because of that action. The fact that the claim arises from an investigation of potential fraud does not alter its nature as a retaliation claim."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008).


### A.     Protected Activity

For a plaintiff to come under the protection of the anti-retaliation provision of the False Claims Act, "[s]pecific awareness of the FCA is not required," but "the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action."  *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).  An employee engages in such protected activity where "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore*, 275 F.3d at 845.

1    Plaintiff has produced evidence that she engaged in protected activities during the course

2    of her employment with JMH.

3    On September 8, 2010, plaintiff sent an email to the Executive Director of Oncology

4    Services (Brenda Carlson), Colombana, the Radiation Oncology Manager of the JMH Concord

5    campus (Rekha Patel — who would later replace her), and the Director of Colorectal, Thoracic

6    and Urology (Janice Hoss) about the guidelines related to physician supervision in treating

7    Medicare patients, because she wanted "their opinion on what they were reading." Dkt. No. 46-1,

8    Plaintiff Depo. at 52-56; Dkt. No. 46-3, Exh. to Decl. of Fitzsimmons at 15. She wrote:

9    I am not comfortable with the statement that we currently have direct supervision
     of all our radiation therapy treatments. According to these guidelines and the
10   statements made . . . at the Dec. 2009 . . . conference, we do not. We have direct
     supervision most of the time, but not all of the time. . . . Please review and see if
11   you agree based on these definitions.

12   Dkt. No. 46-3, Exh. to Decl. of Fitzsimmons at 15.

13   In early April 2012 plaintiff instigated an email chain between Jeff Farris (a Quality and

14   Compliance Supervisor at JMH) and Colombana investigating the physician supervision

15   requirements in radiation oncology. Plaintiff wrote to Colombana, "We need to search [the CMS]

16   site for Physician supervision . . . specific to speciality procedures[.]" Dkt. No. 59-2, Exh. to

17   Decl. of Kunst at 111. Colombana forwarded plaintiff's email to Farris, writing, "For Radiation

18   Oncology." *Id.* Farris replied to Colombana's email by writing to plaintiff (Colombana was

19   carbon copied on the email). *Id.* at 110. Farris wrote, "I've attached two documents that cover the

20   physician supervision requirements in radiation oncology." *Id.* Plaintiff responded to Colombana,

21   "Thanks . . . this is good . . . I suggest we pass on to Beth and let her define expectations for MDs

22   from JMH compliance perspective[.]" *Id.*

23   A management meeting took place two weeks later where the physician presence

24   requirement was discussed. Dkt. No. 59-2, Exh. to Decl. of Kunst at 121-122. Attendees were

25   told that the issue would be sent to the JMH compliance department and reviewed by it, and

26   information was distributed. Colombana, Dr. Levine, and five other physicians, including Dr.

27   Bice, were present. *Id.* Dr. Bice's statement in his declaration that he "did not participate in any

28   conversation during any such meeting related to that issue" does not address plaintiff's

15

involvement in efforts to raise and investigate matters which reasonably could lead to a viable FCA action.[10]  Dkt. No. 47, Decl. of Bice ¶ 6.

### B.    Employer's Knowledge of the Protected Activity

"An employee is entitled to whistle blower protection only if the employer is aware that the employee is investigating fraud[.]"  *Moore*, 275 F.3d at 846-47 (internal quotation marks and citations omitted)).

Disputed issues of fact remain on the extent to which JHM was aware of plaintiff's protected activities.  First, the Court is not convinced that it should restrict its inquiry regarding JMH's knowledge of plaintiff's protected activities to Dr. Bice alone simply because, as part of JMH's "strategic initiative to centralize management of the two [radiation oncology] Departments," Dr. Bice made the decision to eliminate the Walnut Creek and Concord Manager positions into a single, cross-campus position — effectively eliminating plaintiff's position.  *See* Dkt. No. 45, Motion at 23; Dkt. No. 47, Decl. of Bice ¶¶ 8-11. The record reflects that GMH President Mike Thomas participated in the plan for reorganization, with the support of JMH HR professionals Karen Mamuyac and Alice Villanueva, both of whom had knowledge of the tension that existed between plaintiff and the Radiation Oncology doctors, as well as the "plan" for

---

[10]   In addition to these events, plaintiff's deposition testimony reflects that after the December 2009 conference she discussed the supervision requirements with BATROA physicians and JMH personnel at a meeting, and informed them of their obligation to comply with the supervision requirements as a condition of payment by Medicare.  Dkt. No. 60, Decl. of Plaintiff ¶ 19; Dkt. No. 46-1, Plaintiff Depo. at 45-48.  Plaintiff also states that in either December 2009 or January 2010 she posted the written guidelines on how to comply with the supervision requirements on a shared computer drive and emailed the relevant physicians to tell them where it was located.  She claims that she alerted the physicians in an email where to find the documents and highlighted the areas that showed the supervision requirements so that the requirements "were easy to find."  Plaintiff asserts that she gave the requirements to another physician and "we subsequently distributed th[e requirements] to all the BATROA physicians as well."  Dkt. No. 46-1, Plaintiff Depo. at 45-46.  Plaintiff testified that throughout 2010, 2011, and 2012 she attended monthly management meetings with Colombana, the BATROA doctors, and (after he was hired), Dr. Bice.  Dkt. No. 60, Decl. of Plaintiff ¶ 9.  Plaintiff asserts that at the meetings where Dr. Bice was present she informed the attendants that JMH and BATROA were not compliant with Medicare supervision requirements on numerous occasions — more than 10 times between 2008 and 2012.  *Id.*; Dkt. No. 59-3, Plaintiff Depo. at 18.
    While no documentary or other evidence has been provided to corroborate these assertions, JMH's suggestion during oral argument that plaintiff has no credible evidence in support of this cause of action goes to the weight, rather than the sufficiency, of plaintiff's evidence.

United States District Court
Northern District of California

plaintiff's pending termination. Villanueva wrote in a June 7, 2012 email:

> I met with [Bice] last week, told him we would support him in the plan to exit [plaintiff] from the organization. One of the primary reasons we have carved out [Radiation Oncology] as a separate department and Director is because [Colombana] didn't address the issues with [plaintiff] . . . it's not just the [Walnut Creek] neuro surgeons who have issues with [plaintiff], it's many of the [Radiation Oncology] physicians, some who have called me about her.

Dkt. No. 59-2, Exh. to Decl. of Kunst at 136.

But even were the Court to impute the employer's knowledge to Bice alone, disputed issues of fact remain on the extent of Bice's knowledge of plaintiff's protected activities. First, roughly two weeks after the April 2012 email chain between plaintiff, Farris (a JHM Compliance Supervisor), and Colombana on the subject of physician supervision requirements in Radiation Oncology, the issue was discussed at an April 17, 2012 management meeting where Bice was present. Dkt. No. 59-2, Exh. to Decl. of Kunst at 111-112, 121-122. Bice's statement in his declaration that he "did not participate in any conversation during any such meeting related to that issue" where plaintiff was present or involved raises a credibility determination that further underscores why summary judgment is inappropriate. Dkt. No. 47, Decl. of Bice ¶ 6. Colombana asserts that he alerted Bice in his June 5, 2012 transition memo (which was sent to GMH President Mike Thomas) that resolution of the Medicare on-site supervision requirement was being resolved by the JMH compliance department.[11] Dkt. No. 59-3, Colombana Depo. at 53-56. Bice then eliminated plaintiff's position and terminated her employment on June 18, 2012. Dkt. No. 47, Decl. of Bice ¶ 11.

### C. Causation

In order to survive summary judgment, there must exist a causal link between the employee's protected activity and the employer's adverse employment action. *Moore*, 275 F.3d at 845. "The emphasis of the claim is on the employee's protected action and whether the employer

---

[11] Colombana also asserts that a few days after an early spring 2012 meeting, Dr. Levine approached him and expressed concern about plaintiff's intent to "report them to CMS" regarding what was discussed in the meeting. Dkt. No. 46-2, Colombana Depo. at 53-54. Colombana assured Levine that plaintiff was not going to report JMH or BATROA to CMS. *Id.*

retaliated against the employee *because of* that action."  *Mendiondo*, 521 F.3d at 1103 (emphasis added).

Plaintiff has advanced evidence that could lead a reasonable juror to conclude that her attempts to raise and remediate the physician supervision/Medicare compliance issue led to her termination.  While JMH paints plaintiff as a difficult individual to work with from at least 2006, the record raises questions of fact concerning whether plaintiff's difficulties with communication and physician/employee relations issues also related to or stemmed from her unpopular efforts to force JMH to investigate and address the alleged fraudulent Medicare billing practices.  *See, e.g.*, Dkt. No. 47, Decl. of Bice ¶ 4; Dkt. No. 59-2, Exh. to Decl. of Kunst at 136.

### D.   Pretext

The Ninth Circuit has not expressly determined whether the *McDonnell-Douglas* burden-shifting framework utilized by the courts in analyzing Title VII retaliation claims also applies to whistleblowing claims under the FCA.  *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).  However, many other courts, including in this district, have extended *McDonnell-Douglas* to FCA retaliation claims.  *See Sears v. Hous. Auth. of the Cty. of Monterey*, 2014 WL 1369594, at *7 (N.D. Cal. Apr. 7, 2014); *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 30-31 (1st Cir. 2012) (collecting cases); *see also U.S. ex rel. Berglund v. Boeing Co.*, 835 F.Supp.2d 1020, 1040 (D. Or. 2011); *Neighorn v. Quest Health Care*, 870 F.Supp.2d 1069, 1092 (D. Or. 2012).  In other contexts the Ninth Circuit has analyzed FCA retaliation claims using Title VII standards.  *See Moore*, 275 F.3d at 847-48 (determining that conduct does not constitute "retaliation" under the FCA unless it would be sufficient to constitute an adverse employment action under Title VII).  The parties appear to agree that *McDonnell-Douglas* applies to plaintiff's FCA retaliation claim.  Dkt. No. 45, Motion at 25-26; Dkt. No. 58-3, Oppo. at 29-31.

The Court will therefore apply the *McDonnell-Douglas* balancing analysis here.  *See also Sears*, 2014 WL 1369594, at *7.  As the Court has determined that plaintiff has made a *prima facie* showing, the burden of production now shifts to JMH to articulate a legitimate, non-retaliatory explanation for plaintiff's termination. *See also Berglund*, 835 F.Supp.2d at 1040.  The

18

United States District Court
Northern District of California

1  Court concludes that JMH has done so — JMH asserts that plaintiff was always difficult to work

2  with, that she and Dr. Bice never got along, that a mediator had to be called in 2011 to manage

3  their "communication issues," and that Bice (and many other JMH employees) questioned

4  plaintiff's ability to lead given her abrasive communication style.  According to JMH, plaintiff

5  was terminated because JMH eliminated her position, and they did not rehire her because of her

6  "well-documented history of poor communication, to which [Bice] was personally subjected." *See*

7  Dkt. No. 45, Motion at 8-11, 15-18.

8      Because JMH has successfully stated a non-retaliatory reason for plaintiff's termination,

9  the burden of production shifts back to plaintiff to demonstrate that JMH's proffered explanation

10  is merely a pretext for impermissible retaliation.  *Sears*, 2014 WL 1369594, at *7.  Plaintiff has

11  advanced evidence that raises a disputed question of fact on this issue.  Among other matters, the

12  fact finder is capable of judging and apportioning weight to:  the April 2012 compliance emails

13  between plaintiff, Farris, and Colombana; the close proximity of plaintiff's termination from the

14  April 17, 2012 management meeting where physician supervision requirements were discussed;

15  the number of questionable emails that followed concerning plaintiff and whether HR had "a file

16  on, or . . . 'stuff' on [her]";[12] the positive performance review plaintiff received 10 days prior to

17  being terminated; the extent to which that review may have been influenced by her personal

18  relationship with Colombana; and whether Bice's role advocating for plaintiff's departure,

19  whether supported by Mike Thomas or others in HR at JMH, was in any way influenced by his

20  knowledge of her whistleblowing activities.

21      For these reasons, defendant's motion seeking summary judgment on plaintiff's second

22  cause of action is DENIED.

23

24  **II.    Plaintiff's Third Cause of Action for Retaliation in Violation of California Labor Code § 1102.5**

25

26      Like its federal counterpart, California Labor Code § 1102.5 is a whistleblower statute, the

27  purpose of which is to "encourag[e] workplace whistle-blowers to report unlawful acts without

28
_____
[12] Dkt. No. 59-2, Villanueva Depo. at 79.

19

1   fearing retaliation." *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 287-88 (Cal. 2006)

2   (citations omitted).  "To establish a prima facie case of retaliation, a plaintiff must show that she

3   engaged in protected activity, that she was thereafter subjected to adverse employment action by

4   her employer, and there was a causal link between the two." *Id.* (citations omitted).

5       Plaintiff fails to address the legal framework provided for by statute and case law and

6   instead groups the federal false claims analysis with the California Labor Code § 1102.5 claim.

7   *See* Dkt. No. 58-3, Oppo at 18-25.  It is not clear from plaintiff's amended complaint which

8   subsection of § 1102.5 plaintiff contends JMH violated.  Dkt. No. 28, FAC at 9.  Plaintiff's

9   complaint states that she "engaged in a protected activity in *refusing to participate* in an activity

10  that would violated the Federal False Claims Act, 31 U.S.C. § 3279 *et seq.*" *Id.* (emphasis added).

11  This "refusing to participate" language tracks the statutory language of § 1102.5(c), which states,

12  "An employer, or any person acting on behalf of the employer, shall not retaliate against an

13  employee for refusing to participate in an activity that would result in a violation of state or federal

14  statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

15      With respect to § 1102.5(c), the evidence does not reflect a refusal to participate in

16  unlawful conduct. Instead, the evidence shows that plaintiff attempted to investigate, and

17  repeatedly complained about, JMH's Medicare compliance issues.  "Complaining about various

18  conditions is "reporting activity," it is not a refusal to act." *See Robles v. Agreserves, Inc.*, 2016

19  WL 323775, at *35 (E.D. Cal. Jan. 27, 2016); *Tobin v. City & Cnty. of San Francisco Police

20  Dept.*, 2015 WL 1885632, *5-*6 (N.D. Cal. Apr. 24, 2015).  There is simply no evidence that

21  plaintiff refused to perform an activity because she believed it would violate a state or federal rule

22  or regulation.  Without a refusal to engage in "unlawful conduct," plaintiff did not engage in

23  protected activity under § 1102.5(c).  *See Robles*, 2016 WL 323775, at *35; *Tobin*, 2015 WL

24  1885632 at *5-*6; *Mayo v. Recycle to Conserve, Inc.*, 795 F.Supp.2d 1031, 1047 (E.D. Cal. 2011).

25      But even if plaintiff intended her complaint to address the protections of § 1102.5(b), she

26  has failed to demonstrate that she engaged in a protected activity for purposes of this statutory

27  subsection. The California Supreme Court has unequivocally held that § 1102.5(b) "concerns

28  employees who report to public agencies. It does not protect [a] plaintiff, who reported his

United States District Court
Northern District of California

20

suspicions directly to his employer" prior to termination.  *See Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 77 (Cal. 1998); *see also Greer v. Lockheed Martin Corp.,* 855 F. Supp. 2d 979, 989 (N.D. Cal. 2012) ("Plaintiff has not shown that prior to her termination, she engaged in protected activity under Section 1102.5[b] . . . Plaintiff has not alleged that she filed any other complaint with a governmental or law enforcement agency prior to her termination."); *Robles*, 2016 WL 323775, at *35 ("Under the 2013 version of § 1102.5[(b)], only complaints or reports made to a governmental agency are protected; complaints or reports made 'internally' to the employer are not protected. Because [plaintiff] did not report his suspicions to a governmental agency, [plaintiff] did not engage in protected activity for purposes of § 1102.5(b)." (citations omitted)).

It is undisputed that plaintiff was terminated on June 18, 2012, and she did not file her *qui tam* complaint against JMH and BATROA in this Court until April 26, 2013.  Dkt. No. 1, Compl.; Dkt. No. 47, Decl. of Bice ¶ 11.  Plaintiff thus cannot establish her *prima facie* case of retaliation because her termination (the adverse employment action) predated her reporting to the government (the protected activity).

Summary judgment is therefore GRANTED on plaintiff's third cause of action.

III.     **Plaintiff's Fourth and Fifth Causes of Action for Wrongful Termination in Violation of Public Policies**

Plaintiff's fourth and fifth causes of action assert that "JMH's termination of [plaintiff] violated the fundamental public polic[ies] of opposing unlawful activity of an employer embodied in the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* [and] . . . [the] California Labor Code § 1102.5." Dkt. No. 28, FAC at 9-10.

To establish her claim for wrongful termination in violation of the public policies embodied in the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the California Labor Code § 1102.5, plaintiff must state facts similar to her retaliation claims:  that she was terminated based on her complaints about potentially false billing practices.  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1105 (9th Cir. 2008); *see also Haney v. Aramark Unif. Servs., Inc.*, 17 Cal.Rptr.3d 336, 348-49 (Cal. App. 2004).  As detailed above, plaintiff has advanced sufficient

evidence to support her § 3730(h) retaliation claim.  The same evidence supports her claim for wrongful termination in violation of public policy.  Accordingly, the Court denies defendant's motion on plaintiff's fourth cause of action.

Violations of California Labor Code § 1102.5 can support a common law cause of action for wrongful termination in violation of public policy as well.  *See Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012); *Scheu v. Charter Commc'ns, LLC*, Case No. 08-CV-02835-MMM, 2011 WL 3204672, at *20 (C.D. Cal. July 27, 2011) ("Violations of California Labor Code § 1102.5 . . . constitute public policy within the meaning of *Tameny* and its progeny."). Because the Court has determined that plaintiff's cause of action for retaliation pursuant to § 102.5 cannot survive summary judgment, there remains no viable violation of California Labor Code § 1102.5, and summary judgment will be granted on this cause of action.

The Court DENIES defendant's summary judgment motion on plaintiff's fourth cause of action and GRANTS defendant's summary judgment motion on plaintiff's fifth cause of action.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** defendant's summary judgment motion on plaintiff's second cause of action, **GRANTS** defendant's summary judgment motion on plaintiff's third cause of action, **DENIES** summary judgment on plaintiff's fourth cause of action, and **GRANTS** summary judgment on plaintiff's fifth cause of action.[13]

**IT IS SO ORDERED**.

Dated:  June 29, 2016

SUSAN ILLSTON
United States District Judge

---

[13] Plaintiff's objections to the Declarations of Kerry Aiton, Imar Moreira, Jill Peterson, and Leslie Yewell are OVERRULED as moot. *See* Dkt. No. 58-3, Oppo. at 31 (citing Dkt. Nos. 50, 51, 52, 54).  The Court did not rely on the content of the challenged statements in reaching its conclusions.

United States District Court
Northern District of California